NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Raymond DEMAIO, | |
| Plaintiff, | |
| v. | Civ. No. 10-3475 |
| RIGHT MANAGEMENT, INC., | OPINION |
| Defendant. | |

THOMPSON, U.S.D.J.

### I. INTRODUCTION

This matter has come before the Court upon the Motion for Summary Judgment filed by Defendant Right Management, Inc. (Docket Entry No. 23). Plaintiff Raymond DeMaio opposes the motion. (Docket Entry No. 24). The Court has decided the matter upon consideration of the parties' written submissions and without oral argument, pursuant to Fed. R. Civ. P. 78(b). For the reasons given below, Defendant's Motion for Summary Judgment is granted.

### II. BACKGROUND

This case concerns Defendant Right Management, Inc.'s ("Right Management") termination of Plaintiff Raymond DeMaio ("DeMaio"). DeMaio alleges that his termination was an unlawful act of age discrimination in violation of the New Jersey Law Against Discrimination.

1

A. *Right Management*

Right Management is a consulting company that provides both career and talent management services. (Def.'s Statement of Material Facts, Docket Entry No. 23, Attach. 2 at ¶ 3).[1] The career management services provided by Right Management consist of outplacement services for individuals who have left or are leaving employment. (*Id*. at ¶ 5). The company's talent management services involve assessing the talent of current and potential employees, developing leaders, and coaching managers. (*Id*. at ¶ 4). At all relevant times, career management services comprised a significantly larger percentage of Right Management's business than talent management services. (Bramley Cert., Docket Entry No. 25, Ex. 20 at 514-15; Ex. 21 at 511-12; Ex. 22, at 728, 734-35). However, Right Management believed that talent management was integral to the long-term health of the company and began placing greater emphasis on this segment of the business in the years immediately preceding DeMaio's termination. (Boshak Cert., Docket Entry No. 23, Attach. 4, Ex. D at 126:2-18; Attach. 5, Ex. K at 34:24-25:2).

B. *Right Management's Decision to Hire DeMaio as General Manager for the Northeast Region*

In 2000, Right Management hired DeMaio and, then in 2006, promoted him to the position of General Manager for the Northeast Region when he was 55 years old. (Def.'s Statement at ¶¶ 6, 8, 9). The Northeast Region included the New England, Connecticut, New York, and New Jersey markets and was one of seven regions that comprised the Americas Group at Right Management. (*Id*. at ¶¶ 10-11). As General Manager for the Northeast Region, DeMaio supervised operations and was responsible for profits and losses. (Plaintiff's Supplemental Statement of Material Facts, Docket Entry No. 24, Attach. 1 at ¶ 22). From shortly after

---

[1] Unless otherwise noted, a citation in this opinion to the Statement of Material Facts submitted by either Plaintiff or Defendant indicates that the cited fact has been admitted by the opposing party.

DeMaio's promotion until he was notified of his termination in April 2010, DeMaio reported to George Herrmann, Executive Vice President of the Americas Group. (*Id*. at ¶¶ 24, 27).

    *C. DeMaio's Performance as General Manager Based on Billings*

During his tenure as General Manager, DeMaio's region consistently increased total combined billings (career management and talent management billings combined) and outperformed other regions in this aspect of the business. In 2007, total combined billings for the Northeast Region increased from $36.6 million to $50.1 million, which was approximately $10 million above plan and 125% of the region's goal. (Pl.'s Statement at ¶¶ 38-40). The Northeast Region saw additional increases in total combined billings in 2008, reaching $53.3 million and achieving 123% of plan. (*Id*. at ¶ 44). In 2009, total combined billings increased again to $69.1 million, which was 125% of plan. (*Id.* at ¶ 48). During the first quarter of 2010, DeMaio's last full quarter before he was terminated, the Northeast Region's total combined billings were $18.3 million or 125% of plan. (Bramley Cert., Docket Entry No. 25, Ex. 13 at 79). With these total combined billings figures, the Northeast Region had the highest total combined billings in the world from 2007 to 2009 while DeMaio was General Manager. (Pl.'s Statement at ¶¶ 41, 45, 49).

The total combined billing numbers can be broken down into career management and talent management figures. While the Northeast Region's career management billings increased while DeMaio was General Manager, talent management billings declined. (Bramley Cert., Docket Entry No. 25, Ex. 27). However, talent management sales dropped in every region but one during this time, with an average decline of 35% between 2007 and 2009. (Pl.'s Statement at ¶¶ 135-36). Therefore, despite an overall decrease in talent management billings, the Northeast Region ranked third out of the seven regions in talent management billings in 2009.

3

(*Id*. at ¶ 149).  Additionally, the Northeast Region ranked third out of the seven regions in talent management billings as a percentage of plan, achieving 78.1% of plan.  (*Id*. at ¶ 151).  On average, the regions in the Americas Group achieved only 64.5% of plan during this time.  (*Id*. at ¶ 152).

Despite experiencing a decline in talent management figures, the Northeast Region met talent management goals set by DeMaio's supervisor, Herrmann.  Herrmann, asked DeMaio to average between $200,000 and $300,000 in monthly talent management sales during the first quarter of 2010, a relatively low goal to account for the fact that the Northeast Region was operating without a Talent Management Practice Leader.  (*Id*. at ¶ 146; Bramley Cert., Docket Entry No. 26, Ex. 46 at 160:13-20).  President/COO Douglas Matthews testified that DeMaio was given a low target range in talent management for 2009 to assist him in meeting goals.  (Boshak Cert., Docket Entry No. 23, Attach. 4, Ex. G at 190:12-191:16).  The Northeast Region produced talent management billings within the target range, averaging $230,000 in talent management billings during the first quarter of 2010.  (Pl.'s Statement at ¶ 147).

   D.  *DeMaio's Performance as General Manager Based on Evaluations*

DeMaio was evaluated by Herrmann in written performance evaluations in 2007 and 2008.  (*Id*. at ¶¶ 63, 66, 70).  In 2007, DeMaio was given an overall performance rating of "4 - Exemplary" on a scale with a maximum score of 5.  (*Id*. at ¶ 63).  A rating of "4" indicated that DeMaio "exceed[ed] expectations and consistently demonstrat[ed] required behaviors in the manner expected."  (*Id*.).  In the evaluation, DeMaio was praised as a "consummate [General Manager], with a real passion for the business and for strong performance" who "demonstrates a good understanding of [Right Management's] vision and future direction."  (*Id*. at ¶ 64).  The evaluation also encouraged DeMaio, however, "to focus his energies on the [talent management]

4

side of the business where there is [sic] significant opportunities for growth." (Def.'s Statement at ¶ 26).

In his 2008 mid-year review, DeMaio received an overall performance rating of "3.0" which indicates that he was "fully effective" and which William Kellner, the Senior Vice President of Human Resources, testified was a "good" rating. (Pl.'s Statement at ¶ 67). DeMaio received a score of 1 out of 5 or "needs improvement," however, for billing in talent management. (Def.'s Statement at ¶ 29). Herrmann wrote that Demaio had a "very solid year while facing some very big obstacles on the [talent management] side of the business." (Pl.'s Statement at ¶ 68). He also noted, however, that talent management revenue through June "was over $1.2 million less than in 2007" and DeMaio "was slow to react to the region's slow [talent management] start and staffing and leadership issues which have dug a very big hole for the Northeast (and the Americas) for [talent management] this year." (Def.'s Statement at ¶ 30). He encouraged DeMaio "to immediately create some top line momentum in [the third and fourth quarters], which should set up a strong year of [talent management] growth." (*Id*.).

When DeMaio was evaluated again at the end of 2008, DeMaio's overall performance rating increased to 3.47. (Pl.'s Statement at ¶ 69). Herrmann wrote that overall gross margin performance was "strong" due to a "combination of strong [career management] volume, offset by low mix of [talent management] volume and significantly below [target management] gross margins." (Def.'s Statement at ¶ 31).

Herrmann did not prepare a performance review in 2009 for DeMaio or any other general manager. (Pl.'s Statement at ¶ 73). Instead, DeMaio testified that he submitted a mid-year assessment and discussed his performance with Herrmann in September 2009 and January 2010. (*Id*. at ¶¶ 74-75, 77). The nature of those discussions is disputed by the parties. (*See* Responses

and Objections to Pl.'s Supplemental Statement of Material Facts, Docket Entry No. 30, Attach. 1 at ¶¶ 74-78).

   E. *DeMaio's Awards, Salary Increases, Bonuses, and Stock Options*

DeMaio received salary increases every year that he was employed as General Manager. (Pl.'s Statement at ¶ 79). His salary increased from $240,000 to $252,000 in 2008 and again to $258,000 in 2009. (*Id.*). Each salary increase was approved by Herrmann. (*Id.* at ¶¶ 79-80).

DeMaio also received annual performance-based bonuses. (*Id.* at ¶ 81). These bonuses were intended to "reward people for meeting targeted levels of performance and to provide significant upside opportunity if actual performance exceed[ed] targets levels (sic)." (*Id.*). The size of the bonus was determined using performance metric categories, and general managers had a target incentive bonus of 40% of base salary. (*Id.* at ¶¶ 84-86). DeMaio exceeded his target incentive bonus every year, receiving 150%, 148%, and 140% of the target incentive bonus in 2007, 2008, and 2009 respectively. (*Id.* at ¶ 88). Every year, DeMaio received a 100% rating on the "Key Performance Indicator" portion of the bonus which reflected progress toward annual performance goals. (*Id.* at ¶¶ 90-91). However, DeMaio received no bonus for talent management in 2009. (Bramley Cert., Docket Entry No. 25, Ex. 6).

In addition to salary increases and bonuses, DeMaio was also given stock options in 2007, 2008, and 2009. (Pl.'s Statement at ¶ 94). Stock options were awarded "to reward and recognize employees who . . . made significant contributions in the prior year." (*Id.* at ¶ 95). Stock option recipients received a notice that stated: "Your leader has nominated you as one of those employees this year, and the Board of Directors has approved a grant of options to you." (*Id.*). In February 2007, DeMaio was awarded 1,000 stock options. (*Id.* at ¶ 94). He was again

issued 1,500 stock options in both February 2008 and February 2009. (*Id.*). Chief Executive Officer Owen Sullivan approved each stock option award to DeMaio. (*Id.* at ¶ 97).

DeMaio also received awards for his performance as General Manager three months before he was terminated. In January 2010, Sullivan and Matthews presented DeMaio with an award for "Highest Total Billings." (Pl.'s Statement at ¶ 52). DeMaio also received an award for being first runner-up in "Highest Client Satisfaction Ratings." (*Id.*).

F. *DeMaio's Termination*

Beginning in 2010, DeMaio participated in monthly phone calls with various executives, including Matthews and Herrmann. (Def.'s Statement at ¶ 58). The purpose of the calls was to provide additional guidance and oversight of managers with deficiencies in talent management; however, DeMaio believed the calls were merely to measure his progress in talent management, rather than calls due to deficiencies in his performance. (*Id.* at ¶¶ 59-60). Matthews found these calls to be disastrous and was "absolutely astonished at how much he didn't know about the business, how off his forecasts were in talent management." (Matthews Dep., Boshak Cert., Docket Entry No. 23, Attach. 4, Ex. G at 85:1-13). DeMaio, however, believed the calls were "positive." (DeMaio Dep., Bramley Cert., Docket Entry No. 26, Ex. 46 at 152:21-153:3).

On April 12, 2010, Herrmann told DeMaio over the phone that DeMaio's employment with Right Management was terminated. (Pl.'s Statement at ¶ 110). Human Resources at Right Management prepared an internal document regarding DeMaio's departure that described his employee status as "Terminated – Involuntary" in two places, stated that the last action taken regarding DeMaio was "terminate," but listed that the reason was "Mutual Agreement." (Bramley Cert., Docket Entry No. 32). Additionally, an initial draft email announcing DeMaio's departure was prepared that stated that "DeMaio has decided to resign from his position of

7

General Manager;" however, the email that was actually sent by Herrmann two days later merely stated that DeMaio was "leaving the position." (Bramley Cert., Docket Entry No. 25, Ex. 15; Docket Entry No. 27, Ex. 59). In his email, Herrmann also acknowledged that DeMaio led the Northeast Region during a "record setting revenue year" in 2009. (Pl.'s Statement at ¶ 53). Several non-supervisory employees who worked with DeMaio expressed surprise at news of his termination because they believed he exceeded expectations and was firmly committed to the company's talent management business. (*Id*. at ¶¶ 180-203).

### G. *DeMaio's Performance Relative to Other General Managers*

Of the seven General Managers in the Americas Group, four produced worse billing numbers in talent management in terms of both total billings and billings as a percentage to plan in 2009. (*Id*. at ¶ 153). Of those four General Managers, all were younger than DeMaio and none was fired for failing to meet talent management goals in 2009. (*Id*. at ¶¶ 153, 154). One of the four managers, Dave M., had been hired in 2009 and was subsequently fired in 2011 for his poor performance in talent management; however, the decision to terminate Dave M. was not made by Herrmann. (Def.'s Statement at ¶ 115).

Right Management hired a younger General Manager, Patricia Leonard, to replace DeMaio and has retained her despite declines in both career management and talent management billings. Leonard was fifty-one years old when she was hired in September 2010. (*Id*. at ¶ 107). Under her leadership, career management revenue declined in 2011 to nearly half of the revenue generated in 2009 under DeMaio's leadership and 14% below plan. (Pl.'s Statement at ¶ 209). The Northeast Region's talent management revenue was 29.3% below plan in 2011, which was the worst percentage to plan of any region in the Americas Group. (*Id*. at ¶ 210). Leonard continues to be employed at Right Management. (*Id*. at ¶ 211).

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248-49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Properly applied, Rule 56 will "isolate and dispose of factually unsupported claims or defenses" before those issues come to trial. *Id.* at 323-24.

### IV.  ANALYSIS

Plaintiff Raymond DeMaio ("DeMaio") brings this age discrimination claim against Defendant Right Management, Inc. ("Right Management") pursuant to the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et. seq.  After reviewing the factual record

in this case, the Court has determined that no genuine issue of material fact exists, and summary judgment in favor of Right Management is proper.

The NJLAD provides that it is unlawful for an employer to discharge an employee due to age. N.J.S.A. 10:5-12(a). Under the NJLAD, discrimination claims are generally evaluated using the analytical framework established under the Age Discrimination in Employment Act. *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 97 (1990); *Henry v. N.J. Dep't of Human Servs.*, 204 N.J. 320, 330 (2010). Under this framework, courts employ the three-step burden-shifting analysis developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

First, the plaintiff under the *McDonnell Douglas* test must establish a *prima facie* case of age discrimination. *Id.* To make a *prima facie* age discrimination case, the plaintiff must prove that he or she was "1) a member of the protected class; 2) the subject of an adverse employment action taken by the defendant; 3) qualified for the position; and 4) replaced by someone sufficiently younger . . . to create an inference of age discrimination." *Kremp v. Wachovia Bank, N.A.*, 2010 WL 4004481, *3 (D.N.J. Oct. 12, 2010) (internal quotations omitted); *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 301 (3d Cir. 2004).

If the plaintiff establishes a *prima facie* case of age discrimination, a presumption of age discrimination is created. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). The burden then shifts to the defendant to articulate a "legitimate non-discriminatory reason for the adverse employment action." *Id.* "This burden [on the defendant] is 'relatively light.'" *Sgro v. Bloomberg L.P.*, 2008 WL 918491, at *8 (D.N.J. Mar. 31, 2008) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Finally, if a legitimate, non-discriminatory reason for the discharge is stated, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that "the employer's stated reasons were not its true reasons but were a pretext for discrimination." *Sempier*, 45 F.3d at 728; *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 503 (3d Cir. 1996). The plaintiff may do so through direct or circumstantial evidence of falsity or discrimination. *Chauhan v. M. Alfieri Co., Inc.*, 897 F.2d 123, 128 (3d Cir. 1990).

In this case, the first two steps in the burden-shifting analysis are easily satisfied. First, Right Management does not contest that DeMaio has made a *prima facie* case for age discrimination. (Def.'s Br., Docket Entry No. 23, Attach. 1 at 23). Second, Right Management states that DeMaio was terminated not because of age discrimination but because:

> senior management found that he: (1) failed to embrace the strategic focus of the Company; (2) failed to successfully manage and/or develop the talent management side of the business; (3) was unprepared for monthly phone calls with [Right Management's] upper management; and (4) failed to show an understanding of the talent management business as evidenced by his inability to forecast talent management sales.

(*Id.*). Essentially, Right Management claims DeMaio was terminated for deficiencies in his talent management performance. DeMaio does not contest that the reason Right Management gives for the termination is legitimate and non-discriminatory. (Pl.'s Br., Docket Entry No. 24 at 17-18). Rather, DeMaio focuses his argument on whether Right Management's stated reason was the true, motivating reason for his termination. Therefore, the issue in this case is whether Right Management's stated reason for DeMaio's termination is a pretext for discrimination.

Pretext is "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs; in essence, pretext is a cover-up for a discriminatory purpose." *Bowles v. Camden*, 993 F. Supp. 255, 262 (D.N.J. Feb. 2, 1998) (internal quotations and citations omitted). In analyzing pretext claims, if "the plaintiff can produce enough evidence to enable a

reasonable factfinder to conclude that the [employer's] proffered reason [for the termination] is false, plaintiff has earned the right to present his or her case to the jury." *Marzano*, 91 F.3d at 508.  The plaintiff need not produce evidence of discriminatory animus as "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

To show that the employer's proffered reason is false, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765.  Because the issue is one of the employer's intent, however, the plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."  *Id*.  "Moreover, a plaintiff's disagreement with a defendant's evaluation of his performance, or the plaintiff's own perception of his performance, does not demonstrate pretext under the *McDonnell Douglas* framework." *Swider v. Ha-Lo Indus., Inc.*, 134 F. Supp. 2d 607, 628 (D.N.J. Mar. 9, 2001) (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 825-27 (3d Cir. 1991)).

In the instant matter, the issue is, therefore, whether a reasonable factfinder could conclude that the reason given by Right Management for DeMaio's termination, his deficiencies in talent management, was not the actual motivation for his termination.  DeMaio attempts to demonstrate several inconsistencies in Right Management's proffered reason.  He argues that Right Management actually evaluated general managers based on the totality of their performance, not talent management performance alone.  He then contends that his overall

performance was outstanding, as evidenced by his region earning the highest total billings, the fact that he was never issued a warning for his performance, as well as the salary increases, bonuses, stock options, and awards he received.  DeMaio then argues that Right Management's allegation that it fired DeMaio for his performance in talent management is not supported by the facts because (1) DeMaio's region had a strong year in talent management in 2009; (2) he achieved the talent management results he was asked to achieve in early 2010; (3) non-supervisory employees believed DeMaio embraced the talent management aspect of the business; and (4) the monthly talent management phone calls with his superiors were positive.  Finally, DeMaio argues that Right Management was inconsistent in its internal documents as to why it terminated DeMaio which suggests Right Management attempted to cover-up its discriminatory motive.

      The Court considers first DeMaio's contention that Right Management actually evaluated its general managers based on total performance rather than talent management performance alone.  To support this argument, DeMaio points to a statement made by CEO Owen Sullivan that job performance was measured "in its totality . . . [it] isn't just career management, it isn't just talent management, it's all of that."  (Pl.'s Br., Docket Entry No. 24 at 18-19).

      The Court notes, however, that Right Management never asserts that general managers were evaluated based on talent management performance alone.  Instead, it argues that it considered talent management to be an important aspect of the business for the company's long-term sustainability.  Furthermore, when read in context, Sullivan's statement does not support DeMaio's proposition that terminating DeMaio based on talent management performance was inconsistent with the company's evaluation policy.  Sullivan's statement was given in response

to the question, "Is your testimony that the billings and revenue numbers are unimportant in evaluating the performance of the general managers?" He stated:

> I would absolutely tell you the numbers are important, but numbers are about one data point. When I look at, and what I expect the executives to look at is the overall performance of the leadership of the company. Because it's both short term, immediate and long term. It's not just about what we deliver, but how we deliver it in a sustainable way. And that has been the emphasis since the day I took over the company. So to answer your question about how we measure performance, how I look at performance, it's in its totality. And it certainly wasn't and isn't just career management, it isn't just talent management, it's all of that, and it's not only what, but how.

(Sullivan Dep., Bramley Cert., Docket Entry No. 27, Ex. 54 at 89:4-19). Rather than show that Right Management considered DeMaio's performance in talent management in violation of the company's evaluation policy, the statement reveals that general managers were evaluated on a number of factors, including talent management. The fact that Sullivan states it was one of several factors considered does not demonstrate that a decision to fire him for talent management performance was inconsistent with the evaluation policy, even in light of a strong performance in other areas. Therefore, the Court does not find that Right Management's decision to terminate DeMaio for his performance in talent management is inconsistent with its evaluation policy.

Furthermore, the Court is not persuaded by DeMaio's argument that his outstanding performance in career management renders a decision to fire him for his performance in talent management, a relatively small portion of the business, implausible. This argument essentially amounts to a challenge to the wisdom of Right Management's decision to terminate DeMaio. Right Management consistently demonstrated its dissatisfaction with DeMaio's talent management performance in its evaluations. Thus, although DeMaio may be of the opinion that his benefit to the company in career management was so great as to outweigh any deficiencies in talent management, Right Management clearly disagreed. Since the issue is whether Right

Management is motivated by discriminatory animus, not whether Right Management is wise, shrewd, prudent or competent, the Court finds this argument unpersuasive.

DeMaio's argument that Right Management's "total failure to warn DeMaio about any alleged problem with his job performance" or "place[] him on a performance improvement plan" is evidence of pretext is similarly without merit. (Pl.'s Br., Docket Entry No. 24 at 20). He cites *Bowles v. City of Camden*, 993 F. Supp. 255 (D.N.J. 1998), for the proposition that the absence of documentation collaborating dissatisfaction with the plaintiff's performance supports a claim that the explanation for the discharge was a pretext. *Bowles*, 993 F. Supp. at 264. This case is easily distinguished from *Bowles*, however, as Right Management did, in fact, document its dissatisfaction with DeMaio's talent management performance in each of his written evaluations. Thus, *Bowles* does not apply or support a finding of pretext in this case.

The Court also disagrees that Right Management's proffered reason for terminating DeMaio is not supported by the facts. DeMaio does not dispute that each of DeMaio's written evaluations evidences Right Management's disappointment with his performance in talent management. Additionally, in disputing that Right Management found his talent management progress calls disastrous, DeMaio cites only his own perception of the phone calls. Similarly, DeMaio cites testimony of other non-supervisory employees to show that they believed he fully embraced talent management and, therefore, Right Management's strategic vision. That DeMaio and other non-supervisory employees disagreed with Right Management's evaluation of DeMaio's performance does not demonstrate pretext, as the issue is whether Right Management believed DeMaio's performance to be deficient.

The Court is also not persuaded that Right Management's decision to award salary increases, bonuses, stock options, and awards to DeMaio is inconsistent with its decision to

terminate him for talent management deficiencies. This is particularly true in a case such as this where there is no evidence that the salary increases and stock options were granted for his performance in talent management, and the achievement awards DeMaio received were for categories unrelated to talent management. Furthermore, bonuses were tied to set metrics which resulted in DeMaio receiving no bonus for his performance in talent management.

      Finally, DeMaio contends that Right Management provided inconsistent reasoning for its decision to terminate DeMaio and initially attempted to cover up DeMaio's unlawful termination. While DeMaio's termination sheet states several times that he was terminated involuntarily yet lists the reason for the termination as "mutual agreement," the Court is unconvinced that this shows such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Right Management's stated reason for terminating DeMaio that a reasonable factfinder could rationally find it unworthy of credence. Thus, without more, DeMaio has failed to prove by a preponderance of the evidence that Right Management's reason for firing DeMaio was a pretext for discrimination, and Right Management is entitled to summary judgment.

## V. CONCLUSION

      For the foregoing reasons, Defendant's motion for summary judgment is granted. An appropriate order will follow.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

Date: December 14, 2012

16